# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3928
No. 01-4022

_____

| | |
|---|---|
| SOB, Inc., et al., | * |
| | * |
| Plaintiffs - Appellants/ | * |
| Cross Appellees, | *  Appeals from the United States |
| | *  District Court for the |
| v. | *  District of Minnesota. |
| County of Benton, | * |
| | * |
| Defendant - Appellee/ | * |
| Cross Appellant. | * |

_____

Submitted:  October 10, 2002

Filed:  January 24, 2003
_____

Before LOKEN, BEAM, and MELLOY, Circuit Judges.
_____

LOKEN, Circuit Judge.

The primary issue in this case is whether Benton County, Minnesota, violated the First Amendment by enacting an ordinance prohibiting live nude dancing entertainment when there was evidence presented to the County Commissioners suggesting that existing adult entertainment establishments had not adversely affected nearby property values or crime rates.  The issue is surprisingly complex because it lies at the intersection of two related but distinct lines of Supreme Court First Amendment decisions.

After SOB, Inc. opened Sugar Daddy's, an alcohol-free cabaret featuring live nude dancing, the Benton County Board of Commissioners enacted Ordinance 332 ("the Ordinance") generally prohibiting "public indecency":

> Public Indecency Prohibited. A person, who knowingly or intentionally in a public setting or place:
>
> A. appears in a state of nudity;
>
> B. fondles the genitals of himself or herself, or
>
> C. fondles the genitals of another person;
>
> commits public indecency and is guilty of a misdemeanor under Minnesota law and upon conviction thereof, shall be punished by a fine of up to $1,000 or by imprisonment for up to 90 days, or both.

The Ordinance compelled Sugar Daddy's female dancers to cover their breasts and genitals with pasties and G-strings while performing. SOB, Inc. and three dancers (collectively, "Sugar Daddy's") commenced this action to declare the Ordinance overbroad and contrary to their protected First Amendment interests in live nude dancing and to enjoin its enforcement. Sugar Daddy's manager, Mark Van Gelder, and his wife joined as plaintiffs and asserted a claim that another aspect of the Ordinance violates their due process, equal protection, and privacy rights.

After consolidating plaintiffs' motion for a preliminary injunction with the trial on the merits, the district court held that the Ordinance is constitutional, but the court enjoined the County from enforcing it "by means of custodial arrest." S.O.B., Inc. v. County of Benton, 171 F. Supp. 2d 978 (D. Minn. 2001). Both sides appeal this final order. We affirm the district court's decision except we vacate the injunction against custodial arrest.

# I. The Public Nudity Prohibition.

Non-obscene erotic and sexually explicit speech are entitled to some First Amendment protection. But businesses that market sexually explicit speech and expressive conduct may be regulated to the extent their activities are perceived as having adverse social and economic effects on society. For example, a law prohibiting the sale of sexually oriented materials to minors was upheld against a First Amendment challenge in Ginsberg v. New York, 390 U.S. 629, 634, 640-42 (1968). More recently, the Supreme Court has considered First Amendment challenges to two different kinds of regulatory action taken by local governments to attack the perceived negative effects of non-obscene adult entertainment: the use of traditional urban zoning strategies to restrict the time, place, and manner in which adult entertainment may be marketed, and the use of traditional public indecency statutes to prohibit certain types of sexually expressive conduct. These recent decisions govern our resolution of this appeal.

Zoning issues reached the Supreme Court first. It is now well-established that sexually oriented businesses may be subjected to reasonable time, place, and manner restrictions based upon the nature of the products or services they sell, even though those products and services include an expressive content protected by the First Amendment. See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48-50 (1986); Young v. American Mini Theatres, Inc., 427 U.S. 50, 62-63 (1976). Under Renton, state and local governments may use diverse zoning strategies (for example, either dispersal or concentration) to regulate adverse secondary effects of such businesses such as crime, prostitution, and economic blight. The regulation must be "content neutral" to avoid strict First Amendment scrutiny. But content-neutral in this context means simply that the regulation is *justified* by the legitimate government purpose of reducing or eliminating adverse secondary effects. 475 U.S. at 47-50. If a zoning regulation is content-neutral in this sense, it will withstand First Amendment scrutiny "so long as whatever evidence the city relies upon is reasonably believed to

be relevant to the problem that the city addresses" and the regulation allows for reasonable alternative avenues for communication. Id. at 51-52.

This case involves the second type of regulation, use of a public indecency ordinance to totally prohibit live nude dancing. Public indecency, including nudity, was a crime at common law, and public indecency statutes are clearly within the police power of state and local governments. A First Amendment challenge to this type of regulation first reached the Supreme Court in Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991). The Court upheld the application of Indiana's long-standing public indecency statute to prohibit live nude dancing as entertainment, but no five Justices agreed on a single rationale for that conclusion. Noting that nude dancing is expressive conduct, not pure speech, four Justices applied the four-part test in United States v. O'Brien, 391 U.S. 367, 377 (1968), for judging government action restricting conduct that includes both speech and non-speech elements:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

Applying this test, the Chief Justice, Justice O'Connor, and Justice Kennedy considered Indiana's prohibition of live nude dancing sufficiently justified by the traditional police power to protect morals and public order. Barnes, 501 U.S. at 569. Justice Souter, on the other hand, applied the O'Brien test but looked to Renton for relevant precedent and concluded that the prohibition was justified by "the State's substantial interest in combating the secondary effects of adult entertainment establishments." Id. U.S. at 582. (Justice Scalia, the fifth member of the Barnes majority, concluded that live nude dancing is conduct unprotected by the First

Amendment. The four dissenters concluded that the prohibition was the suppression of protected erotic dancing and could not survive First Amendment strict scrutiny.)

The Court again took up this issue in City of Erie v. Pap's A.M., 529 U.S. 277 (2000). A larger majority again upheld application of an ordinance generally prohibiting public nudity to ban live nude dancing. A four-Justice plurality (Justice O'Connor, joined by the Chief Justice, Justice Kennedy, and Justice Breyer), now agreeing with Justice Souter that the adverse secondary effects analysis of Renton was the proper analytical framework, concluded that the government had a sufficient interest in regulating this sexually explicit conduct because:

> there is nothing objectionable about a city passing a general ordinance to ban public nudity (even though such a ban may place incidental burdens on some protected speech) and at the same time recognizing that one specific occurrence of public nudity -- nude erotic dancing -- is particularly problematic because it produces harmful secondary effects.

529 U.S. at 295. The plurality then concluded that the City of Erie ordinance passed muster under the four-part O'Brien test because:

> [t]he ordinance regulates conduct, and any incidental impact on the expressive element of nude dancing is *de minimis*. The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message.

Id. at 301. Justice Souter dissented in part, agreeing with the plurality's analytical approach but voting to remand because the City of Erie had not made an evidentiary record supporting its claim of adverse secondary effects. (Justice Scalia, joined by Justice Thomas, concurred, adhering to his approach in Barnes: "The traditional power of government to foster good morals[,] . . . and the acceptability of the

traditional judgment (if Erie wishes to endorse it) that nude public dancing *itself* is immoral, have not been repealed by the First Amendment." 529 U.S. at 310. Justice Stevens and Justice Ginsburg dissented, adhering to the position of the dissenters in Barnes and criticizing the majority for extending Renton's adverse secondary effects analysis to the absolute prohibition of live nude dancing.)

The final relevant Supreme Court precedent is another zoning case, the Court's very recent decision in City of Los Angeles v. Alameda Books, Inc., 122 S. Ct. 1728 (2002). Alameda Books probed the evidentiary parameters of the Renton test, considering whether Los Angeles had presented sufficient evidence of adverse secondary effects to avoid summary judgment invalidating an amendment to its zoning ordinance that prohibited more than one adult entertainment business from operating in the same building. Once again, Alameda Books produced no majority opinion. A four-Justice plurality (Justice O'Connor, joined by the Chief Justice, Justice Scalia, and Justice Thomas), in concluding that the City had made a sufficient showing to survive summary judgment, granted substantial but not total deference to the City's legislative judgment about how to combat adverse secondary effects:

> This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in Renton. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

122 S. Ct. at 1736. Justice Kennedy concurred but cautioned that, to justify a zoning ordinance under Renton, "a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, *while leaving the*

-6-

*quantity and accessibility of speech substantially intact.*" Id. at 1742 (emphasis added). Justice Souter for the four dissenters concluded that the City's earlier studies regarding adverse secondary effects totally failed to support this amendment *and therefore* the amendment was impermissible content-based regulation.

Applying these Supreme Court precedents to this case, we can quickly isolate the critical inquiry. A ban on live nude dancing is content-neutral if its purpose is to combat harmful secondary effects, even though the ban"has some minimal effect on the erotic message by muting that portion of the expression that occurs when the last stitch [of clothing] is dropped." Pap's, 529 U.S. at 294; see ILQ Invs., Inc. v. City of Rochester, 25 F.3d 1413, 1416 (8th Cir. 1994). Here, the Ordinance states that its purpose is to "prohibit public indecency in order to deter criminal activity, to promote societal order and public health and to protect children," and it includes express findings that public indecency can increase criminal activity, including prostitution, disorderly conduct and sexual assault; expose children to an unhealthy and nurtureless environment; foster social disorder by disrupting the orderly operation of public events and public accommodations; and present health concerns in places of public accommodation and other public settings. Sugar Daddy's argues these findings are unsupported and suggests the Ordinance's stated purpose is pretextual. But Sugar Daddy's virtually concedes, and we conclude, that the Ordinance is content-neutral within the meaning of Pap's and therefore subject to intermediate First Amendment scrutiny under the four-part O'Brien test.

Likewise, Sugar Daddy's does not argue that the Ordinance fails the fourth part of the O'Brien test, that "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of [the substantial governmental] interest." In Pap's, 529 U.S. at 289, the plurality declared that live nude dancing is a form of expressive conduct that "falls only within the outer ambit of the First Amendment's protection." The plurality then concluded that an absolute prohibition on such conduct meets the O'Brien test because "[t]he requirement that

dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message." Id. at 301 (plurality opinion).[1]

Thus, the fighting issue in this case, as it was in Alameda Books, is whether the County had sufficient evidence of adverse secondary effects to justify enacting the Ordinance. Before enactment, the County Commissioners gathered studies by other municipalities and other evidence of the adverse secondary effects associated with adult entertainment businesses. At the public hearing, concerned citizens spoke in favor of the Ordinance. Mark Van Gelder presented evidence suggesting that Sugar Daddy's and the King's Inn, a Benton County adult entertainment establishment that had been in business for nearly eight years, had neither caused higher crime rates nor depressed the value of nearby properties in the time they had been operating.[2] Sugar Daddy's also submitted an article criticizing the methodologies of the secondary effects studies relied upon by other municipalities, Bryant Paul, et al., Government Regulation of "Adult" Businesses Through Zoning and Anti-Nudity Ordinances:

---

[1]"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" Marks v. United States, 430 U.S. 188, 193 (1977). Applying this test, Justice O'Connor's opinion for the four-Justice plurality in Pap's stated the holding of the Court. See Nightclub Mgmt., Ltd. v. City of Cannon Falls, 95 F. Supp. 2d 1027, 1040-41 (D. Minn. 2000). On the other hand, Justice Kennedy's more narrow concurrence in Alameda Books stated the holding of the Court in that case.

[2]Van Gelder presented statistics showing fewer police calls to Sugar Daddy's in the prior year than to a local gas station, and a report suggesting that the value of properties near Sugar Daddy's and the King's Inn increased more from 1994 to 2001 than the value of properties near two businesses that do not feature nude dancing. The record before the Commissioners included contrary evidence and argument submitted by proponents of the Ordinance.

Debunking the Legal Myth of Negative Secondary Effects, 6 COMM. L. & POL. 355 (2001). Sugar Daddy's argues that, on this record, the County had an insufficient basis for concluding that the Ordinance is needed to further the substantial government interest in combating harmful secondary effects.

Though neither Pap's nor Alameda Books squarely resolves the issue, we conclude that Sugar Daddy's theory is unsound. Its local evidence addressed only two adverse secondary effects, property values and crime in the vicinity of an adult entertainment establishment. These are issues particularly relevant to zoning. A ban on live nude dancing, on the other hand, may address other adverse secondary effects, such as the likelihood that an establishment whose dancers and customers routinely violate long-established standards of public decency will foster illegal activity such as drug use, prostitution, tax evasion, and fraud.[3] Moreover, zoning restrictions typically impact a broad range of adult entertainment businesses, whereas a ban on live nude dancing imposes a *de minimis* restriction on expressive conduct, while otherwise "leaving the quantity and accessibility of speech substantially intact." Alameda Books, 122 S. Ct. at 1742 (Kennedy, J., concurring).

Justice O'Connor, writing for the four-justice plurality in Pap's, afforded substantial deference to legislative judgments regarding secondary-effects:

> [I]n terms of demonstrating that such secondary effects pose a threat, the city need not conduct new studies or produce evidence independent of that already generated by other cities to demonstrate the problem of secondary effects, so long as whatever evidence the city relies upon is *reasonably believed to be relevant to the problem that the city addresses*.

---

[3]The record before the County Commissioners included testimony presented by a former strip-club manager to the Michigan Legislature in the year 2000 describing how such establishments promote these kinds of illegal activities.

529 U.S. at 296 (emphasis added, quotations omitted); see Jake's, Ltd., Inc. v. City of Coates, 284 F.3d 884, 886 (8th Cir.), cert. denied, 123 S. Ct. 413 (2002). The plurality squarely rejected the dissent's view that the City must come forward with evidence showing that pasties and G-strings reduce crime:

> To be sure, requiring dancers to wear pasties and G-strings may not greatly reduce these secondary effects, but [the four-part O'Brien test] requires only that the regulation further the interest in combating such effects. . . . [T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.

529 U.S. at 301 (plurality opinion) (quotation omitted). The four-Justice plurality in Alameda Books was equally deferential in reviewing a zoning ordinance which had a broader impact on protected First Amendment interests. Justice Kennedy's concurring opinion in Alameda Books was somewhat less deferential than the plurality to local legislative judgments as to the adverse secondary effects purportedly addressed by zoning regulations. But Justice Kennedy joined the plurality opinions in Barnes as well as Pap's, and he did not even cite those cases in his Alameda Books concurrence, which means there is nothing to suggest that he has retreated from his votes in Barnes and Pap's. In these circumstances, we conclude that the Court's holding in Pap's is still controlling regarding the deference to be afforded local governments that decide to ban live nude dancing. Therefore, Sugar Daddy's failed to cast sufficient doubt on the County's rationale for the Ordinance, and the district court's decision that the ban on live nude dancing is constitutional must be affirmed.[4]

_____

[4]In its cross-appeal, Benton County argues that two of the district court's findings of fact are clearly erroneous. Neither finding affects our conclusion that the County's ban on live nude dancing survives First Amendment intermediate scrutiny. Accordingly, we need not address these fact-finding issues.

## II. Claims That the Ordinance Is Overbroad.

Ordinarily, a party may not facially challenge a law on the ground that it would be unconstitutional if applied to someone else. See New York v. Ferber, 458 U.S. 747, 767 (1982). An exception to that general rule is the First Amendment overbreadth doctrine. To prevent the chilling of protected First Amendment interests, this doctrine permits "an individual whose own speech or conduct may be prohibited . . . to challenge a statute on its face because it also threatens others not before the court -- those who desire to engage in legally protected expression but who may refrain from doing so." Ways v. City of Lincoln, 274 F.3d 514, 518 (8th Cir. 2001) (quotation omitted). A judicial declaration that a law is unconstitutionally overbroad "is, manifestly, strong medicine." Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973). Therefore, "where a statute regulates expressive conduct, the scope of the statute does not render it unconstitutional unless its overbreadth is not only real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Osborne v. Ohio, 495 U.S. 103, 112 (1990) (quotation omitted).

**A. Does the Ordinance Chill Legitimate Theater?** Sugar Daddy's argues that, even if the Ordinance is constitutional as applied to live nude dancing, it is unconstitutionally overbroad because its prohibition against the public fondling of genitals chills constitutionally protected conduct. For example, Sugar Daddy's warns that an actor playing the role of the manager in a local production of *Damn Yankees* could be subject to criminal penalties for adjusting his athletic protector.

In Farkas v. Miller, 151 F.3d 900, 905 (8th Cir. 1998), we upheld application of a public nudity statute to prohibit live nude dancing, rejecting an overbreadth argument because the statute included an exception for "a theater, concert hall, art center, museum, or similar establishment . . . primarily devoted to the arts or theatrical performances." On the other hand, in Ways, 274 F.3d at 519, in striking down an ordinance more broadly prohibiting sexual contact in entertainment businesses, we

noted that among other flaws the ordinance lacked an exception for artistic venues. In this case, the Ordinance has an exemption for "any theatrical production performed in a theater by a professional or amateur theatrical or musical company which has serious artistic merit." But unlike the exemption in Farkas, this exemption is inexplicably limited to the Ordinance's public-nudity prohibition, so it does not appear to limit the public-genital-fondling prohibition.

An uncontradicted affidavit by the County Attorney avers that there are no theaters in Benton County. Moreover, the County Attorney represents that "it is not the intent of the prosecutorial authority for Benton County to now or in the future enforce the provisions of Ordinance 332 on any theatrical production . . . which has serious artistic merit." "In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n.5 (1982). Thus, the record does not support an inference that protected theatrical activity is presently being chilled, or that the County will ever enforce the genital-fondling prohibition against the cast of a theatrical production. On this record, we agree with the district court that the Ordinance is not substantially overbroad, judged in relation to its plainly legitimate sweep. Accord J&B Entm't, Inc. v. City of Jackson, 152 F.3d 362, 366-67 (5th Cir. 1998).

**B. The Van Gelders' Right to Privacy Claim.** The Ordinance prohibits nudity and the fondling of genitals "in a public setting or place." The definition of public place includes hotels and motels but specifically excludes "enclosed single sex motel rooms and hotel rooms designed and intended for sleeping accommodations." Limiting the exclusion to "single sex" hotel rooms seems like a dreadful example of bad drafting.[5] Reading the limitation literally, Mark Van Gelder and his wife seek to

---

[5]The same linguistic nonsense infected the City of Cannon Falls ordinance upheld against other challenges in Nightclub Mgmt., 95 F. Supp. 2d 1027.

enjoin enforcement of the Ordinance, to the extent it "criminalizes marital sexual relations within hotel rooms within Benton County," because it infringes their alleged constitutional right to marital and sexual privacy. Pressing literalism to an unreasonable extreme, the Van Gelders further assert that the Ordinance violates their right to equal protection because the single sex limitation permits homosexuals but not heterosexuals to engage in sexual relations in hotel rooms.

The complaint alleges that Mr. Van Gelder "fears that . . . he and his wife could be subject to criminal prosecution if they engaged in normal marital activities within such a motel or hotel room." But the Van Gelders have presented no evidence of any likelihood that the Ordinance will be enforced against them if they engage in such activity. Indeed, the Benton County Attorney has publicly declared "that Ordinance 332 does not prohibit nudity, genital touching, or any other sexual activity in private hotel and motel rooms." That declaration finds support in the Minnesota canons of statutory construction, which codify presumptions that "[t]he legislature does not intent a result that is absurd, impossible of execution, or unreasonable [and] . . . does not intend to violate the constitution of the United States or of this state." MINN. STAT. § 645.17, subd. (1), (3). Thus, the alleged fear is both without support and patently unreasonable.

As a general rule, a federal court should refrain from entertaining a pre-enforcement constitutional challenge to a state criminal statute in the absence of "a realistic fear of prosecution." Poe v. Ullman, 367 U.S. 497, 508 (1961); see Steffel v. Thompson, 415 U.S. 452, 459 (1974). The Van Gelders' claim does not raise First Amendment issues, and "the existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action." Younger v. Harris, 401 U.S. 37, 51 (1971); see Laird v. Tatum, 408 U.S. 1, 13-14 (1972). On this record, the district court properly dismissed this claim without reaching the merits of the issues.

# III.  The Custodial Arrest Issue.

In addition to asserting that the Ordinance is unconstitutional on its face, Sugar Daddy's complaint sought an order "declar[ing] the practice of enforcing the ordinance by custodial arrest to be an unlawful prior restraint on First and Fourteenth Amendment rights."  Noting that the Ordinance's theatrical exemption requires arresting officers to determine that a live nude dancing performance lacks "serious artistic merit," the district court permanently enjoined enforcement of the Ordinance by means of custodial arrest because "arresting the performer necessarily places a prior restraint on later performances."  Benton County appeals that ruling.

Ordinarily, a federal court will not enjoin enforcement of a state criminal law, even though unconstitutional. "To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights." Wooley v. Maynard, 430 U.S. 705, 712 (1977) (quotation omitted).  We conclude that Sugar Daddy's has failed to demonstrate that exceptional circumstances require an injunction against enforcing the constitutional prohibition of live nude dancing by means of custodial arrest.

In the first place, the risk that Sugar Daddy's dancers will be subject to custodial arrest seems minimal.  A violation of the Ordinance is a misdemeanor. See MINN. STAT. § 609.02, Subd. 3.  The Minnesota Rules of Criminal Procedure require police officers to proceed against misdemeanor offenders by citation rather than custodial arrest, "unless it reasonably appears to the officer that arrest or detention is necessary to prevent bodily harm to the accused or another or further criminal conduct, or that there is a substantial likelihood that the accused will fail to respond to a citation." MINN. R. CRIM. P. 6.01, Subd. 1(1)(a).  Sugar Daddy's has presented no evidence that the County has threatened custodial arrests or will not comply with this rule of criminal procedure.

In the second place, the doctrine of prior restraint is only marginally involved here.  The doctrine recognizes "the time-honored distinction between barring speech in the future and penalizing past speech."  Alexander v. United States, 509 U.S. 544, 554 (1993).  Any custodial arrest will come after a dancer has engaged in live nude dancing (nothing in the record suggests that the county will conduct pre-dance arrests, which would raise more serious First Amendment issues).  The district court concluded that a post-dance arrest "places a prior restraint on later performances."  But in the absence of proof that a dancer's arrest would be followed by extended custody, the only later performances likely to be restrained are additional live nude dances that night.  See Kew v. Senter, 416 F. Supp. 1101, 1106 (N.D. Tex. 1976) ("Nor are future performances prevented, for the performer may post bail and resume her 'expression' as quickly as logistics permit.").

We conclude there is little risk that a custodial arrest will restrain a dancer's *protected* expressive conduct in later performances that same night.  In obscenity cases, the Supreme Court has cautioned that police officers may not seize allegedly obscene materials without some prior judicial evaluation of the obscenity issue.  See Roaden v. Kentucky, 413 U.S. 496, 505-06 (1973).  This is a prior restraint concern that led the court to deny a motion to dismiss a suit to enjoin the arrest of exotic dancers under an obscenity ordinance in Admiral Theatre v. City of Chicago, 832 F. Supp. 1195 (N.D. Ill. 1993).  The district court relied on Admiral Theatre, noting that arresting officers must assess whether a performance has "serious artistic merit" to determine whether the Ordinance's theatrical exception applies. We disagree. While "serious artistic merit" is a component of obscenity jurisprudence, see Miller v. California, 413 U.S. 15, 24 (1973), the Ordinance is not obscenity-based.  The Ordinance's exception applies only to a "theatrical production performed in a theater by a professional or amateur theatrical or musical company."  Thus, an arresting officer will know to a virtual certainty whether a particular live nude performance at Sugar Daddy's falls within the exception.  If not, the Ordinance has been violated, and any similar performances later that evening would also violate the Ordinance.

-15-

In these circumstances, we see no exceptional circumstances warranting pre-enforcement intrusion by a federal court of equity. Any prior restraint issues that may arise should the County elect to enforce the Ordinance through custodial arrest are better left for the state courts to resolve on a specific factual record.

The judgment of the district court is reversed, and the case is remanded with directions to vacate the permanent injunction against "using custodial arrest as a means of enforcing Benton County Ordinance 332 against Plaintiffs or any other person." 171 F. Supp. 2d at 985. In all other respects, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.