**WORLD WIDE VIDEO OF WASHINGTON, INC., Plaintiff–Appellant,**

v.

**CITY OF SPOKANE, Defendant–Appellee.**

**No. 02–35936.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 7, 2004.

Filed May 27, 2004.

As Amended on Denial of Rehearing and Rehearing En Banc July 12, 2004.

---

Gilbert H. Levy, Seattle, WA, on behalf of the plaintiff-appellant.

Stephen A. Smith, Todd L. Nunn, Preston Gates & Ellis, LLP, Seattle, WA, on behalf of the defendant-appellee.

Before GRABER, TALLMAN, and CLIFTON, Circuit Judges.

TALLMAN, Circuit Judge.

This appeal raises two questions. First, whether the City of Spokane's ordinances regulating the location of adult-oriented retail businesses ("adult stores") are constitutional. Second, whether an amortization period is required in this context and, if so, whether a reasonable amount of time was allotted for World Wide Video of

Washington, Inc. ("World Wide"), to either relocate its stores or change the nature of its retail operations. Because the record reveals no genuine issue of material fact regarding either of these issues, we affirm the district court's summary judgment for Spokane.

I

In the late 1990s, city leaders in Spokane grew concerned with the opening of several adult stores in residential areas. To develop a legislative response to this situation, the City compiled information—specifically, studies from other municipalities, relevant court decisions, and police records—documenting the adverse secondary effects of adult stores.

On November 29, 2000, Spokane's Plan Commission held a public hearing to consider amending the Municipal Code to combat these documented secondary effects. At this hearing, the City Attorney's office presented the legislative record and gave the Commission an overview of the effect of adult stores on the community. Although a number of citizens testified in favor of amending the Code, World Wide presented no evidence, testimonial or otherwise, at this hearing.

On December 13, 2000, after considering public comments and the legislative record, the Plan Commission voted unanimously to recommend that the City Council amend the Code. Before the vote at this meeting, two individuals testified against the proposed amendment. Once again, however, World Wide did not participate.

On January 29, 2001, the Spokane City Council heeded the Plan Commission's recommendation and unanimously passed Ordinance C–32778.[1] Under Ordinance C–32778, adult stores are subject to Spokane's set-back requirements, which pre-

---

1. The Code as amended by Ordinance C–32778 reads:

A. An "adult retail use establishment" is an enclosed building, or any portion thereof which, for money or any other

vent them from opening in close proximity to certain land use categories.[2] Ordinance C–32778 also amended the Code to provide adult stores with an amortization period of one year either to relocate or change the nature of their operations. *See* SMC § 11.19.395. A procedure was included whereby the owner of a business could seek an extension of this deadline. *See id.*

Subsequently, Spokane determined that it needed to establish more sites for the relocation of adult stores. Following four Plan Commission meetings on the issue, on March 18, 2002, Spokane enacted Ordinance C–33001, which increased the number of land use categories permitted to accommodate the operation of adult stores.

Because Ordinance C–32778 became effective on March 10, 2001, all non-conforming uses were required to terminate by March 10, 2002. World Wide applied to

Spokane's Planning Director for an extension of the amortization period and was granted an additional six months. World Wide appealed this decision to the city's Hearing Examiner, arguing that a six-month extension was insufficient. The Hearing Examiner affirmed the extension, but held that it would run from the date of his May 15, 2002, decision. World Wide was therefore required to close or change the nature of its businesses by November 15, 2002.[3] Although we were informed at oral argument that the configuration of World Wide's retail services has changed somewhat, the businesses remain open in their original locations.

On February 27, 2002, World Wide filed a § 1983 civil rights action in the United States District Court for the Eastern District of Washington alleging, *inter alia,* that Ordinances C–32778 and C–33001 (hereinafter, "the Ordinances") violate the

---

form of consideration, devotes a significant or substantial portion of stock in trade, to the sale, exchange, rental, loan, trade, transfer, or viewing of "adult oriented merchandise".

B. Adult oriented merchandise means any goods, products, commodities, or other ware, including but not limited to, videos, CD Roms, DVDs, computer disks or other storage devices, magazines, books, pamphlets, posters, cards, periodicals or non-clothing novelties which depict, describe or simulate specified anatomical area, as defined in Section 11.19.0355, or specified sexual activities, as defined in Section 11.19.0356.

Spokane Mun.Code ("SMC") § 11.19.03023.

**2.** Specifically, the Spokane Municipal Code provides:

1. An adult retail use establishment [or] an adult entertainment establishment may not be located or maintained within seven hundred fifty feet, measured from the nearest building of the adult retail use establishment or of the adult entertainment establishment to the nearest building of any of the following pre-existing uses:
   a. public library,

b. public playground or park,
c. public or private school and its grounds, from kindergarten to twelfth grade,
d. nursery school, mini-day care center, or day care center,
e. church, convent, monastery, synagogue, or other place of religious worship,
f. another adult retail use establishment or an adult entertainment establishment, subject to the provisions of this section.

2. An adult retail use establishment or an adult entertainment establishment may not be located within seven hundred fifty feet of any of the following zones:
   a. agricultural,
   b. country residential,
   c. residential suburban,
   d. one-family residence,
   e. two-family residence,
   f. multifamily residence (R3 and R4),
   g. residence-office.

SMC § 11.19.143(D).

**3.** World Wide appealed the Hearing Examiner's ruling to Spokane County Superior Court under Washington's Land Use Petition Act, RCW 36.70C.005, *et seq.*

First Amendment. At the close of discovery, Spokane moved for summary judgment. In support of its motion, the City tendered

(1) more than 1,500 pages of legislative record related to the Ordinances, including studies from other municipalities concerning the adverse secondary effects associated with adult businesses,[4] police reports, relevant court decisions, and evidence submitted by Spokane residents;

(2) the minutes of the Plan Commission and City Council meetings concerning the Ordinances;

(3) a report from a real estate appraiser stating that hundreds of parcels of land zoned for adult retail remained available;[5] and

(4) the declarations of several citizens detailing the secondary effects of the existing adult stores.[6]

In opposition to Spokane's motion for summary judgment, World Wide offered

(1) the declaration of land use planner Bruce McLaughlin, who opined that the studies relied on by Spokane provided no valid basis for the Ordinances because none dealt exclusively with secondary effects produced by retail-only uses and concluded that adult stores in Spokane neither contributed to the depreciation of property values nor resulted in increased calls for police service;

(2) police reports and call summaries intended to corroborate McLaughlin's conclusion;

(3) the report of a private investigator containing interviews of citizens who claimed that there were no problems related to the adult stores in their neighborhoods;[7]

(4) the declaration of a real estate broker stating that there were only 26 available properties and only one was a plausible relocation site for an adult store;[8] and

---

4. Spokane relied on studies from New York City (1994); Garden Grove, California (1991); a coalition of several municipalities in Minnesota (1989); St. Paul, Minnesota (1987); Austin, Texas (1986); Indianapolis, Indiana (1984); Amarillo, Texas (1977); and Los Angeles (1977).

5. When Ordinance C–32778 went into effect, there were a total of seven affected adult stores, six of which were required to relocate. By the time Spokane moved for summary judgment, one affected business had already reopened at a new site. Spokane's appraiser found that 326 properties were available for relocation of adult stores; that 161 of the 326 were best suited for commercial uses; and that 63 of the 161 were actively listed for sale or lease. Applying the set-back requirements of the Ordinances, Spokane determined that 32 of these 63 sites were particularly well-suited to accommodate adult stores.

6. Specifically, these declarants stated that they had witnessed various criminal acts in and around World Wide's stores, including prostitution, drug transactions, public lewd-

ness, harassment of citizens by World Wide's clientele, and pervasive litter, including used condoms, empty liquor bottles, and video packaging featuring graphic depictions of sexual acts.

7. We note that World Wide's investigator indicated in his deposition that he was instructed not to include information in his report that was unhelpful to his client's legal position.

8. Spokane tendered a supplemental declaration from its appraiser with its summary judgment reply, asserting that World Wide's broker ignored 92 qualifying parcels, which were sufficient to allow simultaneous operation of 18 adult stores, and that, even accepting the data contained in World Wide's broker's report, there were sufficient locations to operate 14 adult stores.

Moreover, although World Wide hired a second land use expert, it declined to submit his opinion to the court. World Wide's second expert concluded that there were more than enough possible relocation sites (*i.e.*, 60) for the six stores that needed to move.

(5) evidence that two of World Wide's stores were subject to long-term leases that their landlord was unwilling to dissolve.

Additionally, World Wide suggested in its statement of facts that the citizens who provided declarations in support of Spokane's motion were motivated by their disagreement with the content of World Wide's speech rather than by a desire to combat secondary effects.

On September 11, 2002, the district court granted Spokane's motion for summary judgment. World Wide timely appealed.

## II

We review de novo the district court's grant of summary judgment. *See Coszalter v. City of Salem,* 320 F.3d 968, 973 (9th Cir.2003). Viewing the evidence in the light most favorable to World Wide, we must decide whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See id.*

## A

■ To determine whether Spokane's Ordinances violate the First Amendment, we must first answer the threshold question of whether they are content based, thus meriting strict scrutiny, or content neutral, thus meriting intermediate scrutiny. Under *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), laws aimed at controlling the secondary effects of adult businesses are deemed content neutral. *See id.* at 48–49, 106 S.Ct. 925.[9]

Here, the challenged Ordinances are explicitly intended to combat the secondary effects of adult stores' speech, not to suppress the speech itself. The district court ruled that the purpose of the Ordinances is to regulate the harmful secondary effects associated with sexually oriented businesses. *World Wide Video of Washington, Inc. v. City of Spokane,* 227 F.Supp.2d 1143, 1150-51 (E.D.Wash.2002). The summary judgment record permits no other conclusion as to the purpose of the Ordinances. *See e.g.,* Ordinance C–33001, Preamble/Findings, (4)(k) ("It is not the intent of the proposed zoning provisions to suppress any speech activities protected by the First Amendment ..., but to propose content neutral legislation which addresses the negative secondary impacts of adult retail use and entertainment establishments[.]"). Accordingly, we apply in-

---

**9.** It merits noting that in the Supreme Court's most recent foray into the law of the First Amendment and secondary effects, *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), Justice Kennedy assailed this categorization as a "fiction," asserting that "whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Id.* at 448, 122 S.Ct. 1728 (Kennedy, J., concurring). Nevertheless, Justice Kennedy ultimately agreed that a "zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny," reasoning that "the zoning context provides a built-in legitimate rationale, which rebuts the usual presumption that content-based restrictions are unconstitutional." *Id.* at 448–49, 122 S.Ct. 1728; *accord G.M. Enters., Inc. v. Town of St. Joseph,* 350 F.3d 631, 637 (7th Cir.2003) ("In light of [*Alameda Books* ], we need not decide whether the ordinances are content based or content neutral, so long as we first conclude that they target not 'the activity, but ... its side effects,' and then apply intermediate scrutiny.' ") (citation omitted).

termediate scrutiny. *See Renton,* 475 U.S. at 49, 106 S.Ct. 925.

### B

■ An ordinance aimed at combating the secondary effects of a particular type of speech survives intermediate scrutiny "if it is designed to serve a substantial government interest, is narrowly tailored to serve that interest, and does not unreasonably limit alternative avenues of communication." *Center for Fair Pub. Policy v. Maricopa County,* 336 F.3d 1153, 1166 (9th Cir.2003) (citing *Renton,* 475 U.S. at 50, 106 S.Ct. 925 and *Colacurcio v. City of Kent,* 163 F.3d 545, 551 (9th Cir.1998)), *cert. denied,* 124 S.Ct. 1879 (2004). World Wide does not appeal the district court's determination that the Ordinances leave open adequate alternative avenues of communication. The issue before us is thus limited to whether the Ordinances are narrowly tailored to serve a substantial government interest.

In *Alameda Books,* the Supreme Court "clarif[ied] the [*Renton*] standard for determining whether an [adult-use] ordinance serves a substantial government interest." 535 U.S. at 433, 122 S.Ct. 1728 (plurality opinion). Thus, the proper starting point for evaluating World Wide's appeal is close consideration of *Renton* and *Alameda Books.* Our analysis is also informed by *Maricopa County,* this court's sole interpretation and application of the *Renton/Alameda Books* standard to date.

### 1

The challenged ordinance in *Renton* prohibited adult movie theaters from locating within 1,000 feet of various zones, such as those intended for schools and churches. An adult theater owner sued, arguing, *inter alia,* that because the City of Renton improperly relied on another city's experiences with the secondary effects of adult theaters rather than undertaking its own study, the city had failed to establish that its ordinance served a substantial government interest. *Renton,* 475 U.S. at 50, 106 S.Ct. 925.

We agreed and held in favor of the theater owner, but the Supreme Court reversed. Noting that "a city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect," the Court concluded that we had imposed "an unnecessarily rigid burden of proof." *Id.* (internal quotation marks omitted). The Court held that "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem the city addresses." *Id.* at 51–52, 106 S.Ct. 925.

### 2

Like *Renton, Alameda Books* originated in this circuit. In 1977, the City of Los Angeles conducted a study to assess the secondary effects of adult land uses. *See Alameda Books,* 535 U.S. at 430, 122 S.Ct. 1728. Because that study discovered increased crime in areas with high concentrations of adult businesses, Los Angeles enacted an ordinance regulating their locations. *See id.*

It soon came to light, however, that there was a loophole in the law: multiple adult businesses could congregate in a single building. *See id.* at 431, 122 S.Ct. 1728. Accordingly, Los Angeles amended its ordinance to prohibit more than one adult business from operating under the same roof. *See id.* Two bookstores sued, alleging that the ordinance violated the First Amendment. *See id.* at 432, 122 S.Ct. 1728.

The district court granted summary judgment in favor of the stores. *See id.* at 433, 122 S.Ct. 1728. We affirmed, concluding that Los Angeles "failed to present

evidence upon which it could reasonably rely to demonstrate that its regulation of multiple-use establishments [was] designed to serve the city's substantial interest in reducing crime." *Id.* (internal quotation marks omitted).

In the Supreme Court, *Alameda Books* produced four opinions: a plurality opinion by Justice O'Connor (joined by the Chief Justice, Justice Scalia, and Justice Thomas), a brief concurring statement by Justice Scalia, a concurrence in the judgment by Justice Kennedy, and a dissent by Justice Souter (joined by Justices Stevens and Ginsburg and joined in part by Justice Breyer). A five justice majority—the plurality plus Justice Kennedy—reversed our decision.

Given the fractured nature of the Court's disposition, it is difficult to glean a precise holding from *Alameda Books.* However, under *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), since Justice Kennedy's concurrence was the narrowest opinion joining the Court's judgment, it controls. *See Maricopa County,* 336 F.3d at 1161; *see also Fly Fish, Inc. v. City of Cocoa Beach,* 337 F.3d 1301, 1310 n. 19 (11th Cir.2003); *Ben's Bar, Inc. v. Vill. of Somerset,* 316 F.3d 702, 722 (7th Cir.2003). Thus, we are bound by the plurality opinion, but only insofar as its conclusions do not expand beyond Justice Kennedy's concurrence.

All five Justices in the *Alameda Books* majority affirmed *Renton's* core principle that local governments are not required to conduct their own studies in order to justify an ordinance designed to combat the secondary effects of adult businesses. *See Alameda Books,* 535 U.S. at 438, 122 S.Ct. 1728 (plurality opinion); *id.* at 451, 122 S.Ct. 1728 (Kennedy, J., concurring). Further, the majority of the Court stressed the paramount role of local experimentation in developing legislative responses to secondary effects, given local governments'

superior understanding of their own problems. *See id.* at 440, 122 S.Ct. 1728 (plurality opinion) ("[W]e must acknowledge that the Los Angeles City Council is in a better position than the Judiciary to gather and evaluate data on local problems."); *id.* at 451–52, 122 S.Ct. 1728 (Kennedy, J., concurring) ("The Los Angeles City Council knows the streets of Los Angeles better than we do. It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion.") (citations omitted).

Most importantly, Justice Kennedy did not disagree with the key innovation announced by the *Alameda Books* plurality. To wit:

> The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton.* If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Id.* at 438–39, 122 S.Ct. 1728 (plurality opinion). Announcement of this burden shifting approach fulfilled the *Alameda Books* Court's stated intention in granting certiorari: it "clarif[ied] the standard for determining whether an ordinance serves a substantial government interest." *Id.* at 433, 122 S.Ct. 1728.

At its heart, the limiting principle that Justice Kennedy's concurrence imposes on the plurality opinion concerns the importance of determining and evaluating a

city's "rationale" behind a particular ordinance. While Justice Kennedy did not dispute the plurality's burden-shifting gloss on *Renton*, he stressed that a city's rationale for passing an ordinance aimed at controlling the secondary effects of adult stores "cannot be that when [the ordinance] requires businesses to disperse (or to concentrate), it will force the closure of a number of those businesses, thereby reducing the quantity of protected speech." *Maricopa County*, 336 F.3d at 1163. Justice Kennedy thus concurred with the *Alameda Books* plurality with the following cautionary caveat: "It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech." 535 U.S. at 450, 122 S.Ct. 1728 (Kennedy, J., concurring). A secondary-effects ordinance must be designed to leave "the quantity of speech ... substantially undiminished, and [the] total secondary effects ... significantly reduced." *Id.* at 451, 122 S.Ct. 1728.

### 3

Our recent decision in *Maricopa County* differs slightly from the case before us in that it concerned the constitutionality of a "time" rather than a "place" restriction on adult businesses. *See* 336 F.3d at 1159. In *Maricopa County*, operators of a variety of adult businesses, including "sellers of sexually-related magazines and paraphernalia," *id.* at 1158, challenged an Arizona statute that prohibited them from operating in the early morning hours. The district court upheld the statute and the businesses appealed. Applying *Alameda Books*—which we described as "reaffirm[ing] the *Renton* framework," *id.*

at 1159—a divided panel of this court affirmed.[10]

As in the instant case, the legislative record in *Maricopa County* included both documentary and testimonial evidence. *See id.* at 1157. For example, the Arizona legislature heard testimony describing problems with pornographic litter and prostitution related to the operation of adult businesses adjacent to a residential area. *Id.* at 1157–58. The *Maricopa County* legislative record also included letters discussing reports detailing similar problems in Denver and Minnesota. *Id.* at 1158. We concluded that the state provided a sufficient basis for the challenged statute, noting that the evidence was "hardly overwhelming, but it does not have to be." *Id.* at 1168. Because the Arizona legislature relied on evidence "reasonably believed to be relevant" to the targeted problem, we determined that the statute was presumptively constitutional. *Id.*

Having made this determination, we continued: "Under *Alameda Books*, the burden now shifts to [the businesses] to cast direct doubt on [the state's] rationale, either by demonstrating that the [state's] evidence does not support its rationale or by furnishing evidence that disputes the[state's] factual findings." *Id.* (internal quotation marks omitted; first alteration added). Essentially, the *Maricopa County* businesses argued that "the evidence before the Arizona legislature consisted of 'irrelevant anecdotes' and 'isolated' incidents, and that testimonial evidence is not 'real' evidence." *Id.* Rejecting this contention as explicitly foreclosed by *Alameda Books*, we concluded that the businesses had "failed to cast doubt on the state's

---

10. In dissent, Judge Canby opined that Arizona's statute could not survive Justice Kennedy's requirement that the quantity of speech remain undiminished because it required adult businesses to close down during certain parts of the day—*i.e.,* it *stopped*

speech—unlike a "dispersal" regulation, which merely *moves* speech. *Maricopa County*, 336 F.3d at 1172 (Canby, J., dissenting). Spokane's Ordinances are dispersal ordinances; consequently, Judge Canby's concern does not arise here.

theory, or on the evidence the state relied on in support of that theory," and affirmed the district court's decision upholding the statute. *Id.*

## C

■ Like the statute challenged in *Maricopa County*, Spokane's Ordinances satisfy the *Renton* standard as clarified in *Alameda Books*. We hold that the Ordinances are narrowly tailored to serve Spokane's substantial interest in reducing the undesirable secondary effects of adult stores.

### 1

Turning first to the substantial interest issue, per Justice Kennedy's *Alameda Books* concurrence, the initial question is "how speech will fare" under the Ordinances. 535 U.S. at 450, 122 S.Ct. 1728 (Kennedy, J., concurring); *see also R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402, 408 (7th Cir.2004) (noting that under Justice Kennedy's *Alameda Books* concurrence "[i]t is essential . . . to consider the impact or effect that the ordinance will have on speech"). Conceptually, this question dovetails with the requirement that an ordinance must leave open adequate alternative avenues of communication. Again, World Wide does not appeal the district court's conclusion that the Ordinances left open sufficient relocation sites. Given that each of the six remaining affected stores has the opportunity to relocate, it is likely that the Ordinances will reduce secondary effects—by moving the stores from sensitive areas—without substantially reducing speech by forcing stores to close. *See Alameda Books*, 535 U.S. at 450, 122 S.Ct. 1728 (Kennedy, J., concurring).

The next step is to determine whether the Ordinances survive the burden-shifting regime announced by the *Alameda Books* plurality. They do. World Wide does not contend that Spokane failed to satisfy its initial burden of producing evidence that

"fairly supports" the Ordinances. Rather, World Wide argues that when it provided contrary evidence the burden shifted back to Spokane, and the City failed to supplement the record.

However, in order to shift the burden back to Spokane, World Wide was required to *succeed* in "cast[ing] direct doubt" on the rationale behind the Ordinances, either by showing that the City's evidence does not support it or by supplying its own contrary "*actual and convincing* evidence." *Id.* at 438–39, 122 S.Ct. 1728 (plurality opinion) (emphasis added). Like the businesses in *Maricopa County*, World Wide failed to satisfy this requirement. World Wide's arguments and evidence against the Ordinances were insufficient to trigger the burden shifting contemplated in *Alameda Books*.

■ We reach this conclusion primarily because World Wide did not effectively controvert much of Spokane's evidence through McLaughlin's report or otherwise. In holding that the Ordinances promoted a substantial governmental interest, the district court stressed that Spokane only needed " 'some' evidence to support its Ordinances," and correctly concluded that the "elimination of pornographic litter, by itself, represents a substantial governmental interest, especially as concerns protection of minors." *World Wide Video*, 227 F.Supp.2d at 1157–58. The citizen testimony concerning pornographic litter and public lewdness, standing alone, was sufficient to satisfy the "very little" evidence standard of *Alameda Books*, 535 U.S. at 451, 122 S.Ct. 1728 (Kennedy, J., concurring) (citing *Renton*, 475 U.S. at 51–52, 106 S.Ct. 925). *Accord Maricopa County*, 336 F.3d at 1168; *cf. Stringfellow's of N.Y., Ltd. v. City of New York*, 91 N.Y.2d 382, 400, 671 N.Y.S.2d 406, 694 N.E.2d 407, 417 (N.Y.1998) ("[A]necdotal evidence and reported experience can be as telling as sta-

tistical data and can serve as a legitimate basis for finding negative secondary effects...."). [11]

The relevant question is "whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." *Alameda Books*, 535 U.S. at 441, 122 S.Ct. 1728 (plurality opinion). Here, the protected speech and the secondary effects described in the citizen testimony are inexorably intertwined: the sexual images in the magazines and on the packaging of the videos sold by adult stores may be protected, but if the stores' products are consistently discarded on public ground, municipal regulation may be—and, in this case, is—justified.

Our conclusion concerning the nature of the post-*Alameda Books* evidentiary burden is in line with the weight of federal authority. For example, in *SOB, Inc. v. County of Benton*, 317 F.3d 856 (8th Cir.), cert. denied, —— U.S. ——, 124 S.Ct. 104, 157 L.Ed.2d 38 (2003), the Eighth Circuit noted that the adult business's evidence in opposition to Benton County's zoning regulations

> addressed only two adverse secondary effects, property values and crime in the vicinity of an adult entertainment estab-

lishment.... [The challenged ordinance], on the other hand, may address other adverse secondary effects, such as the likelihood that an establishment whose dancers and customers routinely violate long-established standards of public decency will foster illegal activity such as drug use, prostitution, tax evasion, and fraud.

*Id.* at 863. Just so here. Granted, the evidence tendered by World Wide in opposition to Spokane's motion for summary judgment purported to contradict some of the City's secondary effects evidence. Again, however, World Wide failed to present an effective rebuttal to an entire category of evidence: the public testimony. World Wide attempted to counter the citizens' stories by charging bias. However, this tactic is insufficient to defeat summary judgment. *See Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983). This failure to cast doubt on Spokane's justification for the Ordinances dooms World Wide's challenge.

2

■ We also conclude that the Ordinances are narrowly tailored. A law is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regula-

---

11. In *Tollis Inc. v. San Bernardino County*, 827 F.2d 1329 (9th Cir.1987), San Bernardino County determined that a single showing of an adult movie was sufficient to subject a theater to regulation under an adult-use zoning ordinance. *Id.* at 1331. Because the County "presented *no* evidence that a single showing of an adult movie would have any harmful secondary effects on the communi-

ty," *id.* at 1333 (emphasis added), we affirmed an injunction against enforcement of the ordinance. Although *Tollis* predates *Alameda Books*, the decisions are consistent; the principle remains that a local government must reasonably rely on at least *some* evidence. Here, Spokane clearly satisfied this requirement.

tion." *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985); *accord Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Here, as in *Maricopa County*, it is self-evident that Spokane's asserted interest would be achieved less effectively absent the Ordinances. *See* 336 F.3d at 1169.

The crux of World Wide's argument is that, because Spokane's studies do not deal exclusively with retail-only stores, the City impermissibly relied on "shoddy data[and] reasoning" to justify the Ordinances. *Alameda Books*, 535 U.S. at 438, 122 S.Ct. 1728 (plurality opinion). World Wide relies principally on *Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288 (5th Cir.) (per curiam), *cert. denied*, —— U.S. ——, 124 S.Ct. 466, 157 L.Ed.2d 372 (2003), to support its argument. The *Encore Videos* court, noting that "[a] time, place, and manner regulation meets the narrow tailoring standard if it 'targets and eliminates no more than the exact source of the evil it seeks to remedy,'" *id.* at 293 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988)), found San Antonio's re-zoning of adult stores unconstitutional because the studies on which the city relied "either entirely exclude[d] establishments that provide only take-home videos and books ... or include[d] them but [did] not differentiate the data collected from such businesses from evidence collected from enterprises that provide on-site adult entertainment," *id.* at 294–95.[12] Hoping to repeat *Encore Videos*' success, World Wide presented the district court with an extensive study concluding that problems with increased crime rates and decreased property value were limited to the neighborhood around a store that has preview booths for on-site viewing.

▮ Notwithstanding its proffer, World Wide's reliance on *Encore Videos* is misplaced. In *Encore Videos*, San Antonio apparently relied *only* on other cities' studies to justify its ordinance. *See id.* at 295. Here, Spokane relied on a wide variety of evidence, including studies, police records, and citizen testimony. Further, in this case we can assume, but need not decide, that the distinction between retail-only stores and stores with preview booths is constitutionally relevant. The Ordinances still survive World Wide's challenge because much of the citizen testimony concerned retail-only stores. To take just one example, a pedodontist working in a building less than a block away from a retail-only store complained of pornographic litter, harassment of female employees, vandalism, and decreased business, all resulting from his proximity to the retail-only store. As *Maricopa County* teaches, World Wide's claim that citizen complaints such as these are biased and unscientific is insufficient to cast direct doubt on the Spokane's testimonial evidence. *Maricopa County*, 336 F.3d at 1168 (rejecting the plaintiffs argument "that testimonial evidence is not 'real' evidence").

Among the secondary effects that Spokane sought to curb by enacting the Ordinances are the "economic and aesthetic impacts upon neighboring properties and the community as a whole." Ordinance C–33001, pmbl. at 3. Through testimonial evidence, Spokane has shown that retail-only stores generate these secondary effects and therefore that its interests in enacting

---

**12.** The Fifth Circuit recently clarified its *Encore Videos* opinion, stating that "the ordinance at issue was found not to be narrowly tailored because of both its failure to make an on-site/off-site distinction *and* its low 20% inventory requirement [*i.e.,* the fact that it covered all stores with at least 20% 'adult' merchandise]." *Encore Videos, Inc. v. City of San Antonio*, 352 F.3d 938, 939 (5th Cir.2003) (emphasis added).

the Ordinances "would be achieved less effectively absent the regulation." *Albertini*, 472 U.S. at 689, 105 S.Ct. 2897. World Wide has offered no evidence that meaningfully challenges that conclusion. We thus conclude that the Ordinances are narrowly tailored.

### D

In sum, *Alameda Books* "does not affect [a municipality's] ability to rely on secondary effects studies and certainly does not mandate a trial in every case where a municipality does so." *Bigg Wolf Disc. Video Movie Sales, Inc. v. Montgomery County*, 256 F.Supp.2d 385, 393–94 (D.Md. 2003). The evidence relied on by Spokane "is both reasonable and relevant," *Maricopa County*, 336 F.3d at 1168, and the City's regulatory regime "is likely to cause a significant decrease in secondary effects" at the cost of "a trivial decrease in the quantity of speech," *Alameda Books*, 535 U.S. at 445, 122 S.Ct. 1728 (Kennedy, J., concurring). Therefore, we hold that Spokane's reliance on this evidence was proper and that the Ordinances are narrowly tailored to address the City's legitimate concerns.

### III

■ We must next decide whether the amended Code—specifically, the language added by Ordinance C–32778—is overbroad.[13] Because "the First Amendment needs breathing space ... [,] statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Nonetheless, the Supreme Court has "repeatedly emphasized that where a statute regulates expressive conduct, the scope of the statute does not render it unconstitutional unless its overbreadth is not only real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Osborne v. Ohio*, 495 U.S. 103, 112, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (internal quotation marks omitted); *see also United States v. Adams*, 343 F.3d 1024, 1034 (9th Cir.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 2871, —— L.Ed.2d —— (2004) (No. 03–9072).

Spokane defines an "adult retail establishment" as

an enclosed building, or any portion thereof which, for money or any other form of consideration, devotes a significant or substantial portion of its stock in trade, to the sale, exchange, rental, loan, trade, transfer, or viewing of "adult oriented merchandise".

SMC § 11.19.03023(A). World Wide claims that this definition is unconstitutional on its face. We disagree.

Cases directly addressing the phrase "significant or substantial" in this context have upheld its validity. *See, e.g., Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 53 n. 5, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Alameda Books*, 535 U.S. at 431, 122 S.Ct. 1728. Moreover, this phrase is readily

---

**13.** World Wide waived its claim that Ordinance C–32778's definition of "adult retail establishment" is unconstitutionally vague by failing to present it to the district court. *See United States v. Flores–Payon*, 942 F.2d 556, 558 (9th Cir.1991). This is not a purely legal issue. Had World Wide raised it below, Spokane could have presented evidence in support of its position that the definition is sufficiently precise. *Cf. id.* (noting that an argument not presented to the district court can still be raised on appeal under certain limited circumstances, including when "the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court") (internal quotation marks omitted).

susceptible to a narrowing construction. "[L]anguage similar to the 'significant or substantial' language used in this ordinance has been interpreted previously by state courts in a sufficiently narrow manner to avoid constitutional problems." *Z.J. Gifts D–4, L.L.C. v. City of Littleton,* 311 F.3d 1220, 1229 (10th Cir.2002) (collecting cases), *cert. granted in part,* — U.S. —, 124 S.Ct. 383, 157 L.Ed.2d 274 (2003). We agree and hold that the inclusion of this phrase in Ordinance C–32778 does not render it unconstitutionally overbroad.

World Wide also takes issue with Spokane's "any portion thereof" wording, arguing that as a result of its inclusion the ordinance covers any store with a "portion" that is "significantly" or "substantially" comprised of adult materials. For example, under World Wide's interpretation, a store with a rack of postcards comprising 1% of its stock, 5% of which qualifies as adult material, would fall under the purview of Ordinance C–32778. We read this ordinance differently. The "any portion thereof" clause plainly means that the ordinance is intended to cover stores that occupy only a portion of an enclosed building—*e.g.,* one store in a shopping mall—as distinct from the entire building. This language has nothing to do with the determination whether adult material constitutes a "significant or substantial" portion of a store's stock.[14]

Accordingly, mindful that the facial overbreadth doctrine is "strong medicine" that should be employed "sparingly and only as a last resort," *Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908, we affirm the district court's rejection of World Wide's claim that Ordinance C–32778 is overbroad.

**IV**

■ The final issue before us is the adequacy of the amortization provision. This provision reads, in pertinent part: "Any adult retail use establishment located within the City of Spokane on the date this provision becomes effective, which is made a nonconforming use by this provision, shall be terminated within twelve (12) months of the date this provision becomes effective." SMC § 11.19.395. The Ordinance allows for the extension of a business's termination date "upon the approval of a written application filed with the Planning Director no later than [one] (1) month prior to the end of such twelve (12) month amortization period." *Id.*

Although World Wide applied for and was granted a six-month extension, and received an extra two months via administrative grace, it claims that we should remand for trial because there remains a question of fact whether its hardship outweighs the benefit to the public to be gained from termination of the non-conforming use. *See Ebel v. City of Corona,* 767 F.2d 635, 639 (9th Cir.1985) (per curiam) (adopting the balancing test set out in *Northend Cinema, Inc. v. City of Seattle,* 585 P.2d 1153, 1159–60 (Wash.1978)). Given the length of its leases and various other alleged impediments to relocation—*e.g.,* restrictive covenants, the unwillingness of landlords to rent or sell to an adult store, and the prohibitive cost—World Wide claims that it can prevail under *Ebel's* balancing test.

■ We are not convinced. Nothing in the Constitution forbids municipalities from requiring non-conforming uses to close, change their business, or relocate

**14.** World Wide relies on *Executive Arts Studio, Inc. v. City of Grand Rapids,* 227 F.Supp.2d 731 (W.D.Mich.2002), where the court found overbroad an ordinance that encompassed stores with a "section or segment"

of sexually-explicit magazines. *See id.* at 748. However, that holding was based on a state court's refusal to adopt a limiting construction. *See id.* No Washington state court has so construed Ordinance C–32778.

within a reasonable time period. Here, as in *Baby Tam & Co. v. City of Las Vegas*, 247 F.3d 1003 (9th Cir.2001), World Wide "furnishes no authority for the proposition that a zoning ordinance may not prohibit a use in existence before its enactment," *id.* at 1006. As a general matter, an amortization period is insufficient only if it puts a business in an impossible position due to a shortage of relocation sites. This issue is conceptually indistinguishable from the First Amendment requirement of alternative avenues of communication. *See Jake's, Ltd. v. City of Coates*, 284 F.3d 884, 889 (8th Cir.) (holding that application of an amortization provision is constitutional as long as it complies with *Renton*), *cert. denied*, 537 U.S. 948, 123 S.Ct. 413, 154 L.Ed.2d 292 (2002). Because the district court held that there are sufficient relocation sites in Spokane and World Wide does not appeal that factual determination, we hold that the amortization provision is not unconstitutional.

Finally, in attempting to extend its right to operate at its present locations, World Wide was afforded—and has availed itself of—the full panoply of due process rights. World Wide requested an extension and received eight months; it appealed this decision to Spokane's Hearing Examiner, claiming the extension was too short, and lost. World Wide then filed a land use action in Spokane County Superior Court challenging the denial of its amortization appeal. We conclude that World Wide received all the process it was due.

## V

As conceded by World Wide, municipalities are allowed to "keep the pig out of the parlor" by devising regulations that target the adverse secondary effects of sexually-oriented adult businesses. This is precisely what Spokane did when it enacted the Ordinances. The district court properly

entered summary judgment upholding them.

**AFFIRMED.**